IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MATTHEW FEIMSTER                                                                  PLAINTIFF

v.                                    Case No. 4:23-cv-00446-KGB

WESTINGHOUSE AIR BRAKE
TECHNOLOGIES CORPORATION                                                          DEFENDANT

## OPINION AND ORDER

Plaintiff Matthew Feimster alleges that defendant Westinghouse Air Brake Technologies Corporation ("Wabtec") terminated his employment during approved leave in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* Before the Court is Wabtec's motion for summary judgment (Dkt. No. 19). Mr. Feimster has filed a response to Wabtec's motion for summary judgment (Dkt. No. 24). Wabtec has filed a reply in support of its motion for summary judgment (Dkt. No. 25). For the following reasons, the Court grants Wabtec's motion for summary judgment (Dkt. No. 19).

### I.    Background

Wabtec's motion for summary judgment is supported by its concise statement of material facts (Doc No. 20). Mr. Feimster filed a response to Wabtec's statement of undisputed material facts, to which he attached two exhibits (Dkt. No. 23). Wabtec replied to Mr. Feimster's response to its statement of undisputed material facts (Dkt. No. 26). The following facts are taken from the parties' filings unless otherwise noted.

Mr. Feimster was employed by Wabtec from February 2019 until August 2022 at its Little Rock, Arkansas, facility (Dkt. No. 26, ¶ 1). Mr. Feimster has a continuous service date since 2017 because he began working at the Little Rock facility on December 11, 2017, when it was operated under GE Transportation. He officially began his employment with Wabtec on February 25, 2019,

as the result of a merger between Wabtec and GE Transportation (*Id.*).  Mr. Feimster was employed on an at-will basis (*Id.*, ¶ 2).

In January 2022, Mr. Feimster was promoted to Technician, Material Management II by Gaylene Colliver,[1] Samvontaye ("Sam") Crowell, and Ellen MacGillis (*Id.*, ¶ 3).  Mr. Feimster held that role until the time of his employment termination (*Id.*, ¶ 4).  Mr. Feimster's manager position included supervisory duties over the facility and its employees, as well as a role in receiving deliveries being made to the facility occurring throughout his shift (*Id.*).  Mr. Feimster also stated his job duties included ordering materials for Wabtec's three locations to operate and customer relations tasks (Dkt. No. 23, ¶ 4; 26, ¶ 4).

At all times during his employment, Mr. Feimster reported directly to Mr. Crowell (Dkt. No. 26, ¶ 5).  Mr. Feimster has admitted that he initially had a "really good" relationship with Mr. Crowell for most of his employment (*Id.*, ¶ 6).  According to Mr. Feimster, however, their relationship declined beginning in the second half of 2021 – the last six to eight months of Mr. Feimster's employment with Wabtec – several months before Mr. Feimster requested leave (Dkt. Nos. 23, ¶ 6; 26, ¶ 6).  Mr. Feimster never reported any complaints about Mr. Crowell to Human Resources at any time during his employment with Wabtec (Dkt. No. 26, ¶ 7).

At all relevant times, Wabtec's Little Rock facility was a 24/7 facility (*Id.*, ¶ 8).  At the time of his termination, Mr. Feimster regularly was scheduled to work on Sundays through Thursdays, beginning at 5:30 a.m. (*Id.*, ¶ 9).  Mr. Feimster asserts that, in Wabtec's referenced exhibits, Mr. Feimster's schedule was generally Sunday through Thursday, from 5:30 a.m. to 3:30 p.m.; however, Mr. Feimster testified that he habitually worked until 6 p.m. or 7 p.m. in the evening (Dkt. No. 23, ¶ 9).  Mr. Feimster testified that his schedule frequently changed due to the demands

---

[1]  Mr. Colliver was Mr. Crowell's direct manager.

of the business, requiring him to come in at different times, and that while he was supposed to be at work around 5:30 a.m., he often came in prior to that or worked late (*Id.*). Wabtec responds that it is immaterial whether Mr. Feimster worked earlier than his scheduled start time or later than his scheduled end time on certain days because Mr. Feimster's tardiness was the reason for the challenged employment actions according to Wabtec, and Mr. Feimster has admitted that he was regularly scheduled to work on Sundays through Thursdays, beginning at 5:30 a.m., and arrived at work after 5:30 a.m. on June 12 and June 13, 2022, as well as the prior tardy occasions cited in his April 12, 2022, Final Warning for Attendance (Dkt. No. 26, ¶ 9).

Mr. Feimster admitted that it was important for employees, particularly managers and supervisors, to be on time (*Id.*, ¶ 10). Wabtec's Employee Handbook provides that violations of the code of conduct, including unreported absences or excessive, unexcused tardiness from work and failure to observe working schedules, qualify as grounds for disciplinary action, up to and including termination (*Id.*, ¶ 11).

As early as September 2021, Mr. Crowell contacted Ms. MacGillis, Human Resources Director, to request corrective action, including possible termination of employment, against Mr. Feimster to address attendance and performance problems (*Id.*, ¶ 12). Mr. Feimster has admitted that he believed Mr. Crowell wanted to terminate Mr. Feimster's employment as early as December 2021 – several months before Mr. Feimster requested FMLA leave (*Id.*, ¶ 13).

On April 6, 2022, John Hunter – one of Mr. Feimster's coworkers who worked the nightshift and who Mr. Feimster was supposed to relieve at the start of his shift at 5:30 a.m. – sent Mr. Crowell a text message in which Mr. Hunter asked if Mr. Feimster would be late every Monday because it interfered with Mr. Hunter's ability to get home and get his children ready for school. Mr. Crowell verified Mr. Feimster's tardiness through surveillance video footage and determined

that Mr. Feimster arrived for work tardy, ranging from 30 minutes late to two and one-half hours late, during each of his nine scheduled workdays between March 27, 2022, and April 6, 2022 (*Id.*, ¶ 16).  Mr. Crowell stated that he was prepared to terminate Mr. Feimster's employment at that time; however, after conferring with Ms. MacGillis, they decided to place Mr. Feimster under a Final Warning for Attendance to address his excessive absenteeism (*Id.*, ¶ 17).  Among other things, the April 12, 2022, Final Warning for Attendance letter documented the following concerns:

> On 4/6/2022 you arrived one hour late at 6:34am
> On 4/5/2022 you arrived thirty minutes late and arrived at 6:01am
> On 4/4/2022 you arrived thirty minutes late and arrived at 6:00am
> On 4/3/2022 you arrived forty-five minutes late at 6:21am
> On 3/31/2022 you arrived two and a half hours late and arrived at 8:00am
> On 3/30/2022 you arrived one hour late at 6:28am
> On 3/29/2022 you arrived one hour late arrived at 6:35am
> On 3/28/2022 you arrived thirty minutes late at 6:05am
> On 3/27/2022 you arrived one hour late and arrived at 6:32am
> On 1/31/2022 the customer found you sleeping at 8:59am during your shift.

(*Id.*, ¶ 18).  The Final Warning for Attendance also included snippets of the video surveillance confirming Mr. Feimster's tardiness, as well as a photo of Mr. Feimster sleeping on the job during the January 31, 2022, incident noted in the warning document (*Id.*, ¶ 19).

At his deposition, Mr. Feimster admitted that he believes that it is acceptable for employees to sleep on the job, which he characterized as "a three- or four-minute, five-minute, ten-minute power nap." (*Id.*, ¶ 20).

The Final Warning for Attendance letter also attached Wabtec's Attendance Policy, which clearly provides that regular and punctual attendance is mandatory and that three occurrences of tardiness (and any other unscheduled absence) within a 90-day period is considered excessive (*Id.*, ¶ 21).  The Final Warning for Attendance letter also clearly warned Mr. Feimster that "[f]urther

attendance issues will result in additional disciplinary action up to an including termination from employment." (*Id.*, ¶ 22).

Mr. Crowell delivered the Final Warning for Attendance to Mr. Feimster by hand and then followed up by sending it to Mr. Feimster by email on April 12, 2022 (*Id.*, ¶ 23).  Mr. Feimster stated that he and Mr. Crowell had a conversation about his attendance in late March or early April 2022 but that, prior to that, Mr. Crowell had told him to come in "within reason" of his start time (*Id.*).  Mr. Feimster observed Mr. Crowell, who was, like Mr. Feimster, a supervisor, come in between 9 a.m.-11 a.m. or later regularly (*Id.*).  Wabtec does not deny that Mr. Feimster makes these assertions but points out that Mr. Feimster offers no independent evidence to support his assertions and maintains that Mr. Feimster's assertions in this regard are immaterial because:  (1) it is undisputed that Mr. Crowell was Mr. Feimster's direct supervisor and, therefore, not similarly situated to Mr. Feimster; (2) Mr. Feimster testified that Mr. Crowell, as his boss and the head manager of the facility, had no obligation to contact Mr. Feimster on the days when Mr. Crowell might have arrived late; and (3) Mr. Feimster has admitted that he received the Final Warning for Attendance and that both the Final Warning and Mr. Crowell's cover email to same warned Mr. Feimster:  "In the event you are late again, it could result in your termination." (*Id.*).

All parties admit that, in his cover email, Mr. Crowell again clearly warned Mr. Feimster: "In the event you are late again, it could result in your termination."  Promptly thereafter, Mr. Crowell emailed Ms. MacGillis regarding a possible Performance Improvement Plan (*Id.*, ¶ 24).

Wabtec asserts that, despite the clear warning against further tardiness, Mr. Feimster arrived to work tardy on June 12 and June 13, 2022 – which Mr. Crowell confirmed through video surveillance footage (*Id.*, ¶ 25).  Mr. Feimster does not deny this fact but states that he took calls with customers on his cell phone from his car prior to entering the facility and that he often drove

to the back of Wabtec's facility to see what was being loaded and who was working, which was not captured on the surveillance that Mr. Crowell reviewed to determine that he was arriving late (*Id*.). Wabtec states that Mr. Feimster's assertions are both immaterial and misrepresent his own testimony. Wabtec states that Mr. Feimster's statement that he occasionally took customer calls from his car before he entered the facility is immaterial given his admissions that he arrived to work tardy on June 12 and June 13, 2022, and Wabtec states that Mr. Feimster's statements also misrepresent his own testimony in that, when he was specifically asked about this point, Mr. Feimster did not testify that he was taking any call or driving around the facility on June 12 or June 13 (*Id*.). On the contrary, Mr. Feimster testified:

> Q. Are you claiming that you drove around the parking lot for 45 minutes on June 13th before you came in the facility when this picture was taken of you?

> A. I'm not claiming that at all. I'm saying that I have [on other occasions].

(*Id*. (citing Dkt. No. 20, Ex. 1 (Feimster's Dep. Tr. at 123:3-7)).

On June 12, 2022, Mr. Feimster was observed arriving 15 minutes late to his shift (*Id*., ¶ 26). On June 13, 2022, Mr. Feimster was observed arriving 45 minutes late (*Id*., ¶ 27). At his deposition, Mr. Feimster admitted that he failed to notify Crowell or anyone else that he would be late (*Id*., ¶ 28). Mr. Feimster states that, because he was the supervisor at his facility, he never notified anyone about his arrivals or departures from work, and he was never told to do so, unless it was a situation where he would miss a large amount of time, like half a day of work (*Id*.). Wabtec states that this assertion is not supported by the record and contradicts Mr. Feimster's own admissions in that he admits he received the April 12, 2022, Final Warning for Attendance letter, which attached Wabtec's Attendance Policy ("Policy") (*Id*.). The Policy provided that "absences" included instances of tardiness, that Policy violations were determined by "unscheduled absences," and that "unscheduled absences" occurred "anytime that the employee was scheduled to work and

was unable to report to work without prior notification and approval (generally 24 hour notice)." (*Id.*).

At his deposition, Mr. Feimster admitted that he is not a morning person (*Id.*, ¶ 29).

On June 13, 2022, at 12:26 p.m., Mr. Crowell sent an email to Ms. MacGillis, Mr. Colliver, and Bailey Janelle seeking to terminate Mr. Feimster's employment based on his tardiness on June 12 and June 13 (*Id.*, ¶ 30). On June 13, 2022, at 4:23 p.m., Mr. Colliver sent a Microsoft Teams meeting invitation with the subject line "Matt Feimster" to Ms. MacGillis and Mr. Crowell, and the Wabtec employees stated that this meeting was to discuss the processing of Mr. Feimster's termination (*Id.*, ¶ 31).

On June 14, 2022, Ms. MacGillis prepared a termination letter. Ms. MacGillis stated that the letter was dated June 16, 2022, because that was the date on which they were planning to notify Mr. Feimster of the decision to terminate his employment (*Id.*, ¶ 32). The metadata for the termination letter shows that the document was last modified by Ms. MacGillis on June 14, 2022 at 5:19 p.m. (*Id.*, ¶ 33).

On June 14, 2022, at 7:06 p.m., Mr. Feimster sent an email to Mr. Crowell and Mr. Colliver claiming to need medical leave (*Id.*, ¶ 34). Mr. Feimster testified that he brought up taking leave to treat his health conditions in May 2022, in a conversation in Wabetc's warehouse. Mr. Feimster testified that he told a coworker, "Man, I just – I got to get some – I need to go get some help. My doctors have told me I need to get some help. My family wants me to get some help. I need it." (*Id.*). Mr. Feimster also testified that Mr. Crowell heard Mr. Feimster's comments and replied, "Anybody going to go away for that long, you know, they might as well not even come back." (*Id.*). Wabtec, for purposes of summary judgment only, does not dispute that Mr. Feimster testified

to this in his deposition but maintains the testimony is immaterial to resolving the pending motion (*Id.*).

Mr. Crowell did not see Mr. Feimster's email until later the night of June 14, 2022, and, when he did, Mr. Crowell forwarded it to Ms. MacGillis on June 15, 2022, at 12:26 a.m. (*Id.*, ¶ 35). In a June 15, 2022, email at 12:26 a.m. from Mr. Crowell to Ms. MacGillis, referenced in Mr. Feimster's response, Mr. Crowell forwarded Mr. Feimster's email requesting leave to Ms. MacGillis, which stated in full: "+HR. Thank you." (*Id.*). A separate email Mr. Crowell sent later in the morning on June 15, 2022, at 9:08 a.m., to Ms. MacGillis and Mr. Colliver, stated in full:

> I don't know how all this will affect my request to terminate his employment due to his not adhering to the attendance policy prior to this FMLA stuff that hasn't been approved but I will leave that up to legal and HR.
>
> This is what he sent last night. I didn't open the messages until this morning because at this point I'm over it. I will not communicate with Matt in any form, unless you all tell me otherwise. I can now continue to put my focus on the team members that want to be here and do the work.
>
> Thank you.

(*Id.*).

Mr. Feimster has admitted that Mr. Crowell did not interfere with or prevent the processing or approval of his FMLA leave request (*Id.*, ¶ 36). Mr. Feimster requested FMLA leave at 7:06 p.m. on June 14, 2024 (*Id.*). Mr. Feimster testified that Mr. Crowell did not respond to his texts until he messaged him after returning to work after detox, and Mr. Crowell's only response at that point was to tell Mr. Feimster that he was no longer his contact and that he should reach out to Ms. MacGillis (*Id.*). Mr. Feimster has admitted that his June 14, 2022, email was the first time he requested FMLA leave in writing (Id., ¶ 37).

Neither Mr. Crowell, Mr. Colliver, nor Ms. MacGillis had knowledge of Mr. Feimster's reported need for FMLA leave before the June 14, 2022, email (*Id.*, ¶ 38). Mr. Feimster testified

that he spoke about his need to take leave to get help for his health conditions in May 2022 and that Mr. Crowell was present and heard his comments (*Id.*).

Later the evening of June 14, 2022, Mr. Feimster sent Mr. Crowell the following text message:

> Feimster (8:06 PM): Hey man you (sic) can we talk?
>
> Feimster (10:35 PM): ??
> Ok Sam I'm dead already man!  I hate you hate me!  But you don't understand!!!  I'm trying to prolong this!!!

(*Id.*, ¶ 39).  Mr. Feimster testified that he believed, based on his interactions with Mr. Crowell and statements Mr. Crowell had made about employees leaving work for long periods, that Mr. Crowell would terminate him if he left work to seek medical treatment (*Id.*).  Mr. Feimster further testified that his belief that Mr. Crowell would force him out if he left to get treatment was based on the workload for Wabtec's employees at this facility and the stress Mr. Crowell and Mr. Feimster were under (*Id.*).  Additionally, Mr. Feimster claims to have known that Mr. Crowell had planned to take vacation two weeks after Mr. Feimster left to attend detox (*Id.*).  Mr. Feimster testified that he had tried to prolong leaving for detox because he did not want to go, even though his family believed he needed treatment, and that this was what he was referencing in the text to Mr. Crowell (*Id.*).  Finally, Mr. Feimster stated that he believed that if he had not taken FMLA, he would not have been terminated (*Id.*).  Wabtec, for purposes of summary judgment only, maintains this testimony by Mr. Feimster and his unsupported assertions are argumentative or immaterial to resolving the pending motion (*Id.*).

Mr. Feimster has admitted that nobody at Wabtec made any statement threatening to terminate his employment if he took FMLA leave (*Id.*, ¶ 40).  Wabtec states that the decision was

made to postpone Mr. Feimster's employment termination until after Mr. Feimster's FMLA leave ended (*Id.*, ¶ 41).

The day after his request, Mr. Feimster was notified by Lincoln Financial, Wabtec's third-party leave administrator, that his leave had been approved (*Id.*, ¶ 42). The FMLA leave ultimately was approved for the period of June 15, 2022, through August 8, 2022 (*Id.*, ¶ 43). On June 16, 2022, Mr. Feimster was admitted to Legacy Healing Center for rehabilitation services (*Id.*, ¶ 44). On June 28, 2022, Mr. Feimster was discharged from Legacy Healing Medical Center (*Id.*, ¶ 45).

Mr. Feimster contacted Wabtec about returning to work for the first time in July 2022, which was prior to the scheduled end of leave on August 8, 2022 (*Id.*, ¶ 46). Mr. Feimster stated that he texted Mr. Crowell when he was discharged from rehab and told Mr. Crowell that Mr. Feimster could come in and cover his shifts (*Id.*). Mr. Feimster testified that Mr. Crowell's only response was to refer him to Ms. MacGillis (*Id.*). On July 18, 2022, Ms. MacGillis informed Mr. Feimster that he needed to provide a return-to-work letter from Legacy Healing Center (*Id.*, ¶ 47).

On July 21, 2022, Mr. Feimster forwarded the return-to-work letter he received from Legacy Healing Center to Ms. MacGillis (*Id.*, ¶ 48). On July 19, 2022, while awaiting the return-to-work letter, Ms. MacGillis emailed Mr. Crowell inquiring whether he would like to resume the termination process for Mr. Feimster (*Id.*, ¶ 49). Mr. Crowell responded that he did (*Id.*). Ms. MacGillis prepared a termination letter dated August 9, 2022, which stated that Mr. Feimster's employment with Wabtec was being terminated based on his continued tardiness on June 12 and June 13, 2022, following his April 12, 2022, Final Warning for Attendance letter (*Id.*, ¶ 50). The termination letter Mr. Feimster received on August 20, 2022, was identical to the one being drafted on June 14, 2022, aside from the date at the top (*Id.*, ¶ 51). On August 19, 2022, Ms. MacGillis attempted to call Mr. Feimster to inform him that his employment was terminated (*Id.*, ¶ 52). On

August 20, 2022, Ms. MacGillis sent Mr. Feimster an email confirming that his employment had been terminated due to his attendance violations prior to using FMLA leave (*Id.*, ¶ 53).  Ms. MacGillis further informed Mr. Feimster that the decision to terminate his employment had been postponed so that he could complete his FMLA leave (*Id.*).  The email attached a copy of the August 9, 2022, termination letter (*Id.*).

## II.    Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

Importantly, "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)). "Although employment discrimination cases are 'often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment.'" *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 459 (8th Cir. 2011) (quoting *Fercello*, 612 F.3d at 1077).

### III.    Analysis

#### A.    *Prima Facie* Case

Mr. Feimster claims that Wabtec terminated his employment in retaliation for his taking FMLA leave (Dkt. No. ¶¶ 38-49). An employee alleging an FMLA retaliation claim "must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 866 (8th Cir. 2015) (citing *Pulczinski*, 691 F.3d at 1006). Without direct evidence, an FMLA retaliation claim is "analyzed under the *McDonnell Douglas* framework." *Id.* Mr. Feimster must show that he exercised rights afforded by the FMLA, that he

12

suffered an adverse employment action, and that there was a causal connection between his exercise of rights and the adverse employment action. *Phillips v. Mathews,* 547 F.3d 905, 912 (8th Cir. 2008) (quoting *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir. 2002)). If Mr. Feimster "establishes a prima facie case, 'the burden shifts to the [employer] to articulate a legitimate, nondiscriminatory reason for its challenged actions.' The employee must then demonstrate that the proffered reason is pretext, showing that 'the employer's proffered explanation is unworthy of credence' or 'persuading the court that a prohibited reason more likely motivated the employer.'" *Hudson*, 787 F.3d at 866 (alterations in original) (citations omitted).

### B.    Required Causal Connection

For purposes of its summary judgment motion only, Wabtec does not dispute the first or second prongs of the *prima facie* case. Instead, Wabtec argues that Mr. Feimster cannot establish that there was a causal connection between the adverse action and the protected activity (Dkt. No. 21, at 7, 11-16). Courts evaluate the causal-connection evidence "in [the] light of all the evidence in the record." *EEOC v. Kohler Co.,* 335 F.3d 766, 773, n.7 (8th Cir. 2003). "To establish a causal link between the employee's exercise of FMLA rights and his termination, the employee must prove that an employer's retaliatory motive played a part in the adverse employment action." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (citing *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (internal quotation omitted)). "[E]vidence that gives rise to 'an inference of a retaliatory motive' on the part of the employer is sufficient to establish a causal link." *Id.* at 866 (quoting *Kipp*, 280 F.3d, at 897 (internal quotation omitted)).

### 1.    Temporal Proximity

An employee can establish a causal link between her protected activity and the adverse employment action through temporal proximity. *Id.* at 866. "The mere coincidence of timing,

however, is rarely sufficient to establish the causation element." *Id*. (citing *Haas v. Kelly Serv., Inc.,* 409 F.3d 1030, 1037 (8th Cir. 2005)).  Cases in which the Eighth Circuit Court of Appeals has determined that temporal proximity alone was sufficient to create an inference of the causal link "have uniformly held that the temporal proximity must be 'very close.'"  *Id*. (citing *Wallace v. Sparks Health Sys.,* 415 F.3d 853, 859 (8th Cir. 2005)).

The Eighth Circuit has stated, "[w]e have discounted, albeit with qualification, the possibility that mere temporal proximity between protected act and adverse employment action can establish the necessary causal connection:  'Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'"  *Malloy v. U.S. Postal Service*, 756 F.3d 1088, 1091 (8th Cir. 2014) (citing *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012)).  Taking FMLA leave, however, does not give an employee any greater protection against termination for reasons unrelated to the FMLA than was available before.  *Id*. (citing *Estrada v. Cypress Semiconductor (Minn.) Inc.,* 616 F.3d 866, 871 (8th Cir. 2010)).  "[E]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."  *Malloy*, 756 F.3d at 1091 (citing *Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 1001 (8th Cir. 2011)).

Mr. Feimster cannot make out a *prima facie* case of FMLA retaliation based on temporal proximity.  The record evidence before the Court, even with all reasonable inferences drawn in favor of Mr. Feimster, indicates that Mr. Feimster requested to take FMLA leave on June 14, 2022; Mr. Feimster provided a return-to-work clearance from his healthcare provider on July 21, 2022; and Wabtec terminated Mr. Feimster's employment on August 9, 2022, the date his FMLA leave ended (Dkt. No. 20, ¶¶ 34, 50).  The Eighth Circuit has found causation when proximity was a

"matter of weeks" but not so when the interval was of two months between the complaint and the termination. *Smith,* 302 F.3d at 833. The Eighth Circuit explained that 14 days between the start of FMLA leave and termination was "sufficient, but barely so, to establish causation." *Id.* Here, the timeframe was significantly longer than the 14 days the Eighth Circuit found to be "barely sufficient," and, therefore, too much time to establish causation based on temporal proximity alone. *Id*.

### 2.    Negative Comments

Mr. Feimster seeks to enhance his claim by alleging that Mr. Crowell, his supervisor, made negative comments to him regarding his use of protected leave. *See Watson v. O'Neill,* 365 F.3d 609, 613 (8th Cir. 2004) (finding a causal connection between the employee's protected activity and the adverse employment action where one supervisor said that he was not "going to let a nigger manage my bitches," while another supervisor commented that the employee "would never excel in the agency" because he assisted in a 1993 employment discrimination case against the supervisor). Where an ultimate decisionmaker relies on the discriminatory comments of another employee or supervisor in deciding to terminate the employee, the employee may be able to establish a causal connection. *See Fast v. Southern Union Co., Inc.,* 149 F.3d 885, 891 (8th Cir. 1998).

At his deposition, Mr. Feimster alleged that he had a conversation with a co-worker in Wabtec's warehouse in May 2022 where he said, "Man, I just – I got to get some – I need to go get some help. My doctors have told me I need to get some help. My family wants me to get some help. I need it." (Dkt. No. 23-1, at 7). According to Mr. Feimster, Mr. Crowell overheard the statement and said, "Anybody going to go away for that long, you know, they might as well not even come back." (Dkt. No. 19-2, at 21).

There is no evidence on the record before the Court that the comment Mr. Feimster maintains Mr. Crowell made was related to Mr. Feimster's FMLA request one month later. Additionally, the comment Mr. Feimster maintains Mr. Crowell made occurred a month after Mr. Crowell issued the Final Warning for Attendance to Mr. Feimster on April 12, 2022, and three months before Wabtec terminated Mr. Feimster based on his violations of the Attendance Policy (Dkt. No. 26, ¶¶ 17-18). Mr. Feimster stated at his deposition that Mr. Crowell made no further negative comments to him after May 2022, that Mr. Crowell forwarded his email request for FMLA to Ms. MacGillis in Human Resources for processing, and that neither Mr. Crowell nor anyone else at Wabtec made any negative comments about Mr. Feimster's leave of absence (*Id.*, ¶¶ 36, 40).

Mr. Crowell's alleged statement of discriminatory animus was not made close enough in time to the adverse employment action to establish a causal link. *See Tegley v. Lancaster County, Ne.*, Case No. 4:13-cv-3104, 2014 WL 3058343 (D. Neb. July 7, 2014) (FMLA case discussing closeness in time necessary between statement allegedly evidencing discriminatory animus and adverse employment action necessary to establish discriminatory animus and collecting Eighth Circuit cases); *see also Ramlet v. E.F. Johnson Co.,* 507 F.3d 1149, 1152 (8th Cir. 2007) (determining in ADEA claim that comment made four months prior to plaintiff's termination by sales vice president to persons not involved in the decisional process that he intended to hire "young studs" to replace older sales people was not sufficient to find age discrimination motivated plaintiff's termination).

Mr. Feimster also contends that he requested FMLA leave via an email to Mr. Crowell and Gaileen Colliver, Mr. Crowell's manager, on the evening of June 14, 2024. Mr. Feimster asserts that, when Mr. Crowell forwarded the email to Ms. MacGillis the following morning, he stated

that he "would not communicate with Plaintiff unless Defendant forced him to do so, that he was 'over it,' and that he planned to 'focus on the team members that want to be here and do the work,' clearly referencing [Mr. Feimster's] request for FMLA leave, which [Mr. Feimster] stated was medically necessary and recommended by his doctor." (Dkt. No. 24, at 5 (citing Dkt. No. 23, ¶ 36)). Mr. Feimster characterizes this as "blatant hostility" on the part of Mr. Crowell to Mr. Feimster's requesting FMLA leave (Dkt. No. 24, at 5).

Mr. Feimster's characterization of Mr. Crowell's email is not supported by record evidence, even when all reasonable inferences from that evidence are construed in Mr. Feimster's favor. As set forth above, Mr. Crowell's June 15, 2022, at 9:08 a.m., email to Ms. MacGillis and Mr. Colliver, reads in full:

> I don't know how all this will affect my request to terminate his employment due to his not adhering to the attendance policy prior to this FMLA stuff that hasn't been approved but I will leave that up to legal and HR.
>
> This is what he sent last night. I didn't open the messages until this morning because at this point I'm over it. I will not communicate with Matt in any form, unless you all tell me otherwise. I can now continue to put my focus on the team members that want to be here and do the work.
>
> Thank you.

(*Id*.). Mr. Crowell did not state that he would not communicate with Mr. Feimster unless "forced" to do so. Mr. Feimster has admitted that Mr. Crowell did not interfere with or prevent the processing or approval of his FMLA leave request (*Id*., ¶ 36). There is no evidence on the record before the Court that Mr. Crowell's alleged negative comments were evidence of animus towards Mr. Feimster when he requested protected leave.

### C.    Pretext

Even if the Court were to find that Mr. Feimster could establish causation, Mr. Feimster's FMLA retaliation claim still fails because Wabtec provided a sufficient reason to justify its termination decision, and Mr. Feimster has not come forward with evidence of pretext.

Wabtec notified Mr. Feimster on April 12, 2022, of his violations of its Attendance Policy, which stated that regular and punctual attendance is mandatory.  In its Final Warning for Attendance letter, Wabtec warned Mr. Feimster that "further attendance issues will result in additional disciplinary action up to and including termination from employment." (Dkt. No. 20, ¶ 21-22).  This point was reiterated in the cover letter to the Final Warning for Attendance, where Mr. Crowell again warned Mr. Feimster that if he was late again "it could result in [his] termination." (*Id*., ¶ 24).  Despite the warning, Mr. Feimster arrived late for work June 12 and 13, 2022, which was confirmed through video surveillance (*Id*., ¶¶ 25-27).  Mr. Feimster did not notify Mr. Crowell or anyone else that he would be late (*Id*., ¶ 28).  Mr. Crowell sent an email requesting to terminate Mr. Feimster on June 13, 2022, and Ms. MacGillis prepared Mr. Feimster's termination letter on June 14, 2022, prior to Wabtec receiving Mr. Feimster's email requesting FMLA leave.  Wabtec quickly processed and granted Mr. Feimster's request for FMLA leave. Wabtec terminated Mr. Feimster on August 9, 2022, based on his violations of Attendance Policy which occurred prior to Mr. Feimster formally requesting to take FMLA leave.  *See Willman v. Farmington Area Public School District (ISD 192)*, 655 F. Supp. 3d 797, 809 (D. Minn. 2023).

Mr. Feimster may refute Wabtec's reasons for termination if he can successfully "identify evidence sufficient to create a genuine issue of material fact" on whether the "proffered explanation is merely a pretext for unlawful retaliation." *Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 909 (8th Cir. 2015) (internal quotation omitted).  This entails a showing that the employer's explanation is unworthy of credence because it has no basis in fact or by persuading

the Court that a prohibited reason more likely motivated the employer.  *Id.*  The Court's inquiry is "limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct."  *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (internal quotation omitted).  In other words, the Court is not in a position to re-conduct any investigation into an employee.  Instead, courts typically find evidence of pretext where an employee shows that the employer "(1) failed to follow its own policies, (2) treated similarly situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874–75 (8th Cir. 2010).

"At the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one."  *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (internal quotation marks omitted).  Mr. Feimster must show "that [he] and the employees outside of [his] protected group were similarly situated in all relevant respects[,]" meaning they "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Id.* (internal quotation marks omitted).

Mr. Feimster claims that "every one of [the employees] that ever worked" at the Little Rock Facility was tardy to work but not terminated.  This broad assertion is not sufficient comparator evidence to establish pretext.  *See Beckley v. St. Luke's Episcopal-Presbyterian Hospitals*, Case No. 4:17-cv-1369, 2018 WL 2447796 (E.D. Mo. May 31, 2018) (determining that plaintiff's "general reference to other employees who committed similar violations but were not terminated does not suffice to create a pretextual inference."); *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (determining that "comparators" must be "similarly situated in all relevant respects") (citing *Burton v. Ark. Sec'y of State,* 737 F.3d 1219, 1229 (8th Cir. 2013)).

At his deposition, Mr. Feimster named two individual employees, Elliot Harris and "Kenny," who he asserts were comparators, but Mr. Feimster admitted that neither employee had the same supervisor as he did (Dkt. No. 19-2, at 37, 39). Accordingly, neither employee was a true comparator. *See Bone*, 686 F.3d at 956. Mr. Feimster was Mr. Harris's supervisor (Dkt. No. 19-2, at 37). *See  Akridge v. Kroger Ltd. P'ship I*, Case No. 14-6030, 2015 WL 2449471, at *4 (W.D. Ark. May 21, 2015) (determining that plaintiff's subordinate was not a valid comparator because they did not have same supervisor and were not subject to the same standards). Further, Mr. Feimster testified that "Kenny" was late for work one day and asked him for a ride to work, but he was unable to assist him (Dkt. No. 19-2, at 40). *Ebersole*, 758 F.3d at 925 (determining that "comparators" must be "similarly situated in all relevant respects"). Mr. Feimster admitted that was different than his situation (Dkt. No. 19-2, at 40). Mr. Feimster has not come forward with a valid comparator to establish pretext.

The record before the Court establishes that Wabtec notified Mr. Feimster of the violations of the Attendance Policy on April 12, 2022, in its Final Warning for Attendance letter, and that Wabtec warned him that "further attendance issues will result in additional disciplinary action up to and including termination from employment." (Dkt. No. 20, ¶ 21-22). This point was reiterated in the cover letter to the Final Warning for Attendance, where Mr. Crowell again warned Mr. Feimster that if he was late again "it could result in [his] termination." (*Id.*, ¶ 24). Despite the warning, Mr. Feimster arrived late for work June 12 and 13, 2022 (*Id.*, ¶¶ 25-27). Mr. Feimster did not notify Mr. Crowell or anyone else that he would be late (*Id.*, ¶ 28). Mr. Crowell sent an email requesting to terminate Mr. Feimster on June 13, 2022, and Ms. MacGillis prepared Mr. Feimster's termination letter on June 14, 2022, prior to Wabtec receiving Mr. Feimster's email

requesting FMLA leave. Wabtec terminated Mr. Feimster on August 9, 2022, based on his violations of the Wabtec Attendance Policy.

Mr. Feimster argues that he had no reason to believe that the two new tardies on June 12 and 13, 2022, would lead to his termination because he had previously arrived late multiple times without being terminated (Dkt. No. 24, at 8). He argues that Ms. MacGillis's check in with Mr. Crowell on July 19, 2022, upon receiving Mr. Feimster's return to work documents, to ask if he still wanted to terminate Mr. Feimster, belies Wabtec's argument that Mr. Feimster's termination was a "sure thing" or that Mr. Feimster knew that it was going to occur (*Id*.). He argues that there is no evidence that informed him prior to his use of FMLA leave that he would be terminated.

Mr. Feimster's argument ignores Wabtec's Final Warning for Attendance letter which warned Mr. Feimster that "further attendance issues will result in additional disciplinary action up to and including termination from employment." (Dkt. No. 20, ¶ 21-22). This point was reiterated in the cover letter to the Final Warning for Attendance, where Mr. Crowell again warned Mr. Feimster that if he was late again "it could result in [his] termination." (*Id*., ¶ 24). Despite the warning, Mr. Feimster arrived late for work June 12 and 13, 2022 (*Id*., ¶¶ 25-27).

On the record before the Court, Mr. Feimster has not established a causal connection between his termination and his FMLA leave or that the reason Wabtec cites for Mr. Feimster's termination was pretext. The basis for the decision to terminate Mr. Feimster occurred prior to Mr. Feimster submitting a request for FMLA leave to Wabtec, and the termination occurred after Mr. Feimster was permitted to exercise his right to take FMLA leave. Further, Wabtec followed its own policies in terminating Mr. Feimster. There is no evidence that Wabtec treated employees similarly situated to Mr. Feimster in a disparate manner or that Wabtec shifted its explanation of its employment decision.

**IV.     Conclusion**

The Court grants Wabtec's motion for summary judgment (Dkt. No. 19).   The Court dismisses with prejudice Mr. Feimster's claims under the FMLA (Dkt. No. 1).

So ordered this the 19th day of February, 2025.

Kristine G. Baker
Chief United States District Judge